UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
VINCENT J. AMMIRATO, GARY J. KULIK,
KENNETH H. SALBU, ROBERT J. MURPHY
AND LOUIS VENGILIO,

                        Plaintiffs,               **MEMORANDUM AND ORDER**

         -against-                        CV 07-5204 (ARL)

DURACLEAN INTERNATIONAL, INC.,

                         Defendant.
------------------------------------------------------------X

**LINDSAY, Magistrate Judge:**

      The plaintiffs, Vincent J. Ammirato, Gary J. Kulik, Kenneth H. Salbu, Robert J. Murphy

and Louis Vengilio, commenced this action against the defendant, Duraclean International, Inc.

("Duraclean International") on November 7, 2007, alleging that Duraclean International breached

its contract with the plaintiffs and violated General Business Law § 349 and 18 U.S.C. § 1961, et

seq. ("RICO"), when it failed to repay their loans.  By order dated February 10, 2010, the court

granted the defendant's motion for summary judgment with respect to the plaintiffs' claims under

the General Business Law and RICO and denied the motion with respect to the breach of contract

claim.  Beginning on August 16, 2010, an eight day bench trial was held, which concluded

September 24, 2010.  Having considered all of the evidence and testimony presented, the court

makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

FINDINGS OF FACT

**A.**      **The Relationship between Duraclean International and Steven Diaz**

      The defendant Duraclean International is an Illinois corporation with its principal place of

1

business in Arlington Heights, Illinois.[1]  Duraclean International is in the business of providing cleaning and care services for carpets, rugs, and upholstery through franchised dealers.  Pursuant to its franchise agreements, Duraclean International lends support to its franchises by, among other things, sending its representatives to assist in the opening of franchises, to assist in presentations to new clients, to prepare for trade and mall shows, or to help to set up databases.  Tr. at 1224-25.[2]  Duraclean International also negotiates contracts to make services and goods available to its franchises.  Tr. at 1281-82.  For example, Duraclean International has a contract with the yellow pages so that franchises can advertise at lower rates.  Tr. at 1281.  Duraclean International also has a national equipment rental and labor contract that allows franchises to obtain equipment and labor at the lowest possible rate.  Tr. at 1281-82.  Duraclean International does not have a national advertising program for its franchises.  Tr. at 1293. Vincent Caffarello is the current president and a fifty percent owner of Duraclean International.  Tr. at 5.  Wilbur Gage is the executive vice-president and also owns fifty percent of the company.  Tr. at 131.

In the late 1980s, Steven Diaz ("Diaz"), who is not a party to this action, became a partner of a Duraclean franchise located in Medford, New York.  Tr. at 15, 905.  The franchise was known as Duraclean Fabric Specialist by J & S, Inc. d/b/a Duraclean Specialists ("Duraclean Specialists").  Tr. at 15, 906.   A few years later, Diaz bought out his partner's interest in the Medford franchise and also purchased several additional franchises on Long Island.  Tr. at 15, 905-06, 909.

---

[1]The facts set forth in this section are drawn from the evidence and testimony presented at trial.  To the extent any conclusions of law are included in this section, they are to be treated as conclusions of law.

[2]"Tr." refers to the transcript of the bench trial.

Duraclean Specialists, as with every Duraclean franchise, had a designated a primary marketing area ("PMA") where it could perform carpet and upholstery cleaning and restoration. Tr. at 905-06. A PMA was a delineated geographic area where a franchise could operate. Tr. at 7. The PMA was designed to confine the areas in which marketing and business development took place to avoid conflicts with other franchises. Tr. at 7-8. PMAs were, however, written on a non-exclusive basis so franchises could develop business outside their PMA in areas where no other franchises were located or where they were referred business by existing clients. Tr. at 42-43, 1322-23. The PMA of Diaz's franchises included the Port Jefferson area to Wading River, Port Jefferson, Stony Brook, Smithson-St. James and the Hampton, Tr. at 909-11.

From 2000 to 2006, the Diaz franchises operated under an Ownership Agreement dated December 28, 2000, which was renewed September 20, 2005. Tr. at 922. Pursuant to the Agreement, Duraclean International received approximately two percent of the revenues earned by the Diaz franchises. Tr. at 34, 934. The royalty paid to Duraclean International was based on a declining formula, meaning as revenues increased, the percentage paid to Duraclean International decreased. Tr. at 34.

In early 2000, Caffarello, Duraclean International's president, suspected that Diaz was under-reporting his revenues and not accurately paying royalties to the company so he flew to New York to interview Diaz. Tr. at 27-30, 150. Caffarello never determined whether Diaz was, in fact, under-reporting his revenues. Tr. at 30. In either case, from 2000 to 2004, Diaz's franchises experienced explosive growth, becoming the top grossing franchises in the Duraclean system. Tr. at 31.

In 2004, Caffarello determined to sell his 50% interest in Duraclean International. Tr. at

3

1237. Caffarello offered to sell his interest in the company to his partner William Gage pursuant to their buy/sell agreement, but Gage declined. Tr. at 21. After Gage declined the offer, Diaz offered to purchase Caffarello's shares. Tr. at 21, 952, 1237. On June 30, 2004, Diaz entered into an agreement to purchase Caffarello's shares for $600,000 and executed a note made payable to Caffarello for virtually the entire sum minus a deposit. Tr. at 22-23,69. Diaz become a fifty percent owner of Duraclean International and was made a member of its board of directors.[3] Tr. at 22-23. Caffarello, however, remained the president and treasurer. Tr. at 34. Diaz was never given a position as an officer. Tr. at 1241.

Despite his newly acquired ownership interest in Duraclean International, Diaz's franchise remained in dire straights and, in 2006, Duraclean International terminated Diaz's Duraclean Specialists' franchise agreement. Tr. at 33, 1253,1310. Diaz also defaulted on the note given to Caffarello. Tr. at 69-70. Diaz made one payment on the note in January 2005 and defaulted on his July 2005 payment. Tr. at 69-70. In December 2005, Diaz was sent a cure letter which demanded payment of the $525,000 balance. Tr. at 70. When he failed to cure the default, Caffarello took back his stock and was reinstated as a director. Tr. at 5, 20-21, 26.

## B.      The National Marketing Program

In or around 2003, Diaz started a marketing program for his Duraclean Specialist franchise, which he called the "National Team." Tr. at 956-957. The objective was to pursue large-loss clients. Tr. at 956-957. Diaz envisioned this program as an opportunity to expand his franchise's business by servicing national accounts. Tr. at 956-57. To achieve this goal, he hired

---

[3]At the time, Caffarello was aware that Diaz had filed for bankruptcy sometime in 2000. Caffarello testified that had also loaned money to Diaz after Diaz he had been threatened. Tr. at 61.

John Kelly as his "national director." Tr. at 440, 957. Kelly had been employed by a well known restoration company and apparently had contacts with Fortune 500 companies. Tr. at 956-57. Kelly testified that there was no actual "National Team," inasmuch as he was the team. Tr. at 443. The term "National Team" was simply a marketing tool. Tr. at 443. Kelly believed that any franchise in the system could have developed a similar marketing tool. Tr. at 443.

After hiring Kelly, Diaz contacted Caffarello to discuss his "National Team." Tr. at 960. Caffarello testified that, at the time, one other franchise was also trying to target large loss clients, like hotel chains, in order to increase profitability. Tr. at 38-41. Diaz's "National Team" concept was consistent with Duraclean International's business model that permitted different franchises to be pulled together to perform large jobs anywhere in the United States. Tr. at 134, 167-168, 809. Moreover, targeting national clients was not considered a violation of the PMA as a national customer was not within any one franchise's PMA. Tr. at 44. Diaz frequently consulted Caffarello regarding the "National Team" and considered Caffarello part of the team. Tr. at 962-67. Diaz sought Caffarello's presence at meetings with potential national customers believing that Caffarello's position at Duraclean International would lend credibility to Duraclean Specialists and make Duraclean Specialist seem less "mom and pop." Tr. at 968-71. However, as Kelly explained, in actuality, he and Clay Burt, Duraclean Specialists's marketing director, were the only two people who developed and managed the "national team," Kelly never ran the national team for Duraclean International while he was employed by Duraclean Specialist, and Duraclean International never lent financial support to the national marketing

program being pursued by Diaz. Tr. at 168, 443, 480.[4] Kelly testified that while he was

employed by Diaz, at most, he spoke to Caffarello four times a year. Tr. at 478.

In order to obtain large national accounts, Kelly marketed Duraclean Specialists outside

the PMA for the Diaz' franchises. Tr. at 43-44. Kelly indicated that if he obtained a job from a

Fortune 500 company to do work on a national scale, he knew he could contact other

independent Duraclean franchises to see if they would enter a joint venture with Duraclean

Specialist to perform the work. Tr. at 450-51. To the extent Kelly sought Caffarello's

assistance, it was to lend his support in securing the assistance of other franchises. Tr. at 453. In

addition, Kelly acknowledged that depending on the client, Caffarello's presence at customer

meetings could be helpful in securing the job because it conveyed the idea that the Duraclean

Specialist had the backing of Duraclean International and the other franchises in the Duraclean

system. Tr. at 453-55. Caffarello viewed his participation at client meetings as consistent with

his responsibilities as president of Duraclean International, which included assisting franchises

on the growth of their business. Tr. at 1222-24.

In or around 2003, Kelly secured a job for Duraclean Specialist with the New York State

Construction Authority in connection with a school being built by a contractor named Skanska.

Tr. at 824. Michael Rogers, Vice-President of Waste Recycling Solutions, had to approve

Duraclean Specialist for work as a sub-contractor. Tr. at 828. Because the job required Skanska

to make a sizable outlay of money, Duraclean Specialist's bid documents had to address its

---

[4]Emmanuel Lakios, who is not a party to the lawsuit but was also an investor, testified
that he had been approached by another Diaz employee, Gregory Shine, who carried a business
card that said "Duraclean National Emergency Loss Unit." Tr. at 731. Lakios testified that Diaz
had told him the national team was part of Duraclean International. Tr. at 737.

ability to pay in a timely fashion. Tr. at 825-30. Diaz testified that in bidding on the Skanska job, he submitted a "qual pack" that contained Duraclean Specialist's and Duraclean International's financials along with a Duraclean International certificate of insurance that he had obtained from the company. Tr. at 977-80. After reviewing the financials, a Dun & Bradstreet report, and after speaking to Diaz and Kelly, Rogers believed that he was dealing with a company that had "outlets" throughout the country. Tr. at 829. In fact, Caffarello testified that he had no involvement in the procurement of the Skanska job, and had first became aware that Diaz had used his companies' financials when he was deposed in connection with this case. Tr. at 127-28, 1308.

In 2004, Kelly landed a job with the Disney hotels. Tr. at 48. At the time, there were no other Duraclean franchises in the Disney area. Tr. at 44. In late 2005, through his Disney contact, Kelly was able to secure a job with Proctor & Gamble to clean-up a site in Louisiana that had been damaged by Hurricane Katrina. Tr. at 45-49. After Duraclean Specialists procured the Proctor and Gamble job, Kelly had Diaz contact Caffarello to enlist his assistance. Tr. at 47, 462. At some point, Caffarello helped to organize the manpower needed to complete the job, specifically contacting franchises in Colorado Springs, Columbia, South Carolina, Louisiana and Illinois, who ultimately sent people down to Louisiana to assist on the job. Tr. at 48-49, 1263-1264. Although Duraclean International always offered its franchises leased equipment at discount prices, additional equipment was not need on the Proctor & Gamble job. Tr. at 48, 80-81.

During the same time period, Caffarello also accompanied Diaz and Kelly to a meeting with the risk management team for Caesar's in Las Vegas. Tr. at 84. At the time, Harrah's was

purchasing Caesar's and had casinos located around the country, some in hurricane or flood bound areas. Tr. at 86. Caffarello testified that his reason for attending the meeting was that he wanted to find out what would be needed in the different areas of the country so that he could disseminate the information to other franchises. Tr. at 86, 1279. At the meeting, Caffarello identified himself as the president of Duraclean International, Diaz identified himself as the president of the Duraclean Specialist franchise, and Kelly identified himself as the national accounts director of Duraclean Specialists. Tr. at 86-87. Diaz never got the Caesar's job.

Finally, in 2005, Kelly secured two jobs for Diaz's franchise, specifically, to do work for the Dunes condos in South Florida and Turner Construction in Miami. Tr. at 87-90. In obtaining the jobs, a national sales team approach was used to create the impression that the franchise or other local franchises could respond to the accounts. Tr. at 89-90. Caffarello also helped with respect to the Turner deal, at the request of Kelly, by contacting a franchise in West Palm Beach and Illinois to see if they were interested in participating. Tr. at 1267-68.

Diaz testified that neither he nor Caffarello ever concealed the fact the he was a franchise when he was promoting his national team. Tr. at 972. Once these "national jobs" were procured, Diaz, on behalf of Duraclean Specialists, handled the invoicing, received payment, and paid subcontractors. Tr. at 89-90, 457, 1011-12. With the exception of two invoices that were sent directly from Duraclean International for work that Duraclean International specifically performed on the Turner and Proctor & Gamble jobs, all of the documentation reflected that the work was done solely by Duraclean Specialists. Tr. at 90. Diaz further testified that the money he received at Duraclean Specialists for both local and "national team" jobs were commingled in

the Duraclean Specialists bank accounts.[5]  Tr. at 1027-28.

### C.  The Plaintiffs and their Relationship with Diaz

The plaintiffs, Vincent Ammirato ("Ammirato"), Gary J. Kulik ("Kulik"), Kenneth H. Salbu ("Salbu"), Robert J. Murphy ("Murphy") and Louis Vengilio ("Vengilio") are all residents of Suffolk County, New York.  Ammirato, Kulik, Salbu, and Murphy are teachers in the district where Diaz resides. Vengilio is one of Diaz's neighbors.  In and around 2005, the plaintiffs made loans to Diaz totaling approximately $750,000.[6]

### 1.  Louis Vengilio

Louis Vengilio has been Diaz's neighbor since 1997.  Tr. at 198.  The Vengilio and Diaz families became very close shortly after Diaz moved to Mount Sinai.  Tr. at 198.  The families vacationed together and attended each others holiday and birthday celebrations.  Tr. at 198-200.  Diaz paid for Vengilio's vacation to New Orleans and trip to Las Vegas.  Tr. at 202.  Vengilio believed that Diaz was a true friend who would never tell him anything other than what was true so he "absolutely lived without questioning him."  Tr. at 216-217.

Vengilio believed that financially Diaz was "doing quite well."  Tr. at 202.  Vengilio

---

[5]Diaz also testified that neither he nor is wife had personal bank accounts and that his expenses were paid out of the franchise's operating accounts.  Tr. at 1099.

[6]Emmanuel Lakios, who also invested with Diaz, testified at trial.  Lakios testified that he reviewed materials prepared by Duraclean International that referenced Diaz's franchise and visited Diaz in Florida before making a decision to invest.  Tr. at 738-740.  Lakios also testified that after Diaz failed to return his investment he contacted Caffarello to complain that Diaz had misappropriated funds and Caffarello responded that he had no knowledge of that conduct.  Tr. at 745.  Although Lakios testified that he believed he was investing $700,000 with Duraclean International, he acknowledged that the check he had received from Diaz was from the franchise and that he had previously testified that he had never spoken to anyone at a higher level than Diaz because he was investing in the franchise.  Tr. at 751.  In fact, when Lakios commenced a lawsuit seeking to recover his investment he sued Duraclean Specialist.  Tr. at 780.

9

testified that Diaz was able to constantly spend "to a point of extravagance that was bewildering, just mind boggling at times." Tr. at 202. Vengilio observed Diaz landscaping his two acre property with truck loads of plants, purchasing expensive cars, trucks and campers, and entertaining friends for eight years straight by taking them to Yankee games and Peter Lugers in limousines and purchasing endless rounds of golf. Tr. at 202-06.

In or around 2002, Diaz approached Vengilio with a business proposition. Tr. at 207. By that time, Vengilio believed that Diaz' business had grown from insurance work being serviced out of his yard in Yaphank to mold remediation which extended throughout Long Island, New York City and included out of town work. Tr. at 208-09. Although Diaz did not purchase Caffarello's shares until June 2004,Vengilio testified that in 2003, he was told by Diaz that he was a part-owner in Duraclean International and had very big contract work. Tr. at 208-09, 1005-06. Vengilio believed that Diaz had a national presence by 2003 because he learned from Diaz that he was traveling to Florida to do hurricane remediation and had become a part owner of Duraclean International. Tr. at 211-16. Vengilio testified that Diaz always referred to his business generically as "Duraclean," but he knew he was an owner of Duraclean International. Tr. at 212-17.

Vengilio testified that Diaz introduced him to John Kelly, his "national guy." Tr. at 224-25. Diaz told him that he obtained federal FEMA work because of his minority status. Tr. at 228, 230. Based on what he was told by Diaz, Vengilio believed that the FEMA work would be handled by Kelly's "National Team" on behalf of Duraclean International. Tr. at 228, 230. At some point between 2003 and 2005, Diaz began to talk to Vengilio about investing. Tr. at 223-24. Diaz testified that he told Vengilio that he needed the money for working capital for the

national team and for promoting Duraclean Specialist. Tr. at 1004, 1006, 1017-18.

In June 2005, Vengilio decided to invest with Diaz. Tr. at 234. At the time, Diaz told him the money was going to be used for a hotel job. Tr. at 282. Vengilio testified that despite the fact that he had dismissed Diaz's prior offers to invest, "In May of June '05, [Diaz] tells me how busy he still is. He's never around, which leads me to believe he's very busy. I know the hurricane work in Florida has kept him down there, and a lot of individuals that work out of the Yaphank yard were back and forth. . . . So somewhere in May or June, I elected to invest." Tr. at 234. Vengilio testified at the criminal trial that Diaz showed him a bag of cash which he claimed an investor was picking. Tr. at 267-69. Vengilio expected to earn 15% interest on his $130,000 investment and receive a "Waldbaum's bag of cash" for his six month investment. Tr. at 267-69. But Vengilio acknowledged, it "was an investment based on friendship" and that he had never done his due diligence. Tr. at 249. Vengilio never looked at any promotional materials from Duraclean International and never discussed the loan with anyone other than Diaz. Tr. at 284-85.

On July 15, 2005, Vengilio gave Diaz $20,000. Tr. at 236; Def. Ex. II. On July 18, 2005, Vengilio gave Diaz a second check for $35,000. Def. Ex. JJ. On July 28, 2005, Vengilio gave Diaz a third check for $75,000. Def. Ex. KK. Vengilio testified that Diaz told him the money was going to be used as a capital investment on the front-end for hotel jobs that Duraclean International was doing. Tr. at 243-44. In order to fund his investment, Vengilio took out a home equity loan expecting to be paid back six months.[7] Tr. at 246.

In January or February 2006, Vengilio learned from a "couple of individuals" that Diaz

_____

[7]Diaz testified that Vengilio had approached him about keeping his money in for a year. Tr. at 1020.

was having problems with repayment. Tr. at 252. By March 2006, Diaz offered Vengilio several reasons why he couldn't repay the loan including that the job wasn't finished, that Duraclean International owed him money, and that he had a pending lawsuit. Tr. at 255. When Vengilio told Diaz he was having a hard time repaying his home equity loan, Diaz gave him enough money to make just two monthly payments. Tr. at 260. Vengilio received no more funds from Diaz and was never repaid the loan balance and never contacted Duraclean International after the loans went sour. Tr. at 260-62.

Diaz testified that he felt personally liable for repaying the loan to Vengilio because they were friends but that Duraclean Specialists was legally responsible. Tr. at 1034-35.

### 2. Robert Murphy

Robert Murphy is a teacher and football coach in the Mount Sinai school district. Tr. at 290. Murphy met Diaz in the summer of 2001, when he was coaching the police athletic league. Tr. at 290. Murphy testified that Diaz took a personal interest in his son's well-being both on and off the football field and he often turned to Diaz for business and personal advice. Tr. at 293-94. According to Murphy, Diaz became a "very trusting friend" and Diaz even lent him money to purchase a retirement home and, after the home was purchased, rented the home to help him out. Tr. at 293-94, 302-303.

During the 2004 football season, Diaz advised Murphy that he was leading Duraclean's national response team, but did not clarify whether he was referring to his franchise or Duraclean International. Tr. at 305-07. Murphy testified that Diaz never specified "Duraclean" beyond the word "Duraclean," that he never referred to Duraclean International, nor did he ever see any signs "that said 'national' anything." Tr. at 313, 349, 366. Murphy testified that he first learned of the

existence of Duraclean International at his deposition in this case. Tr. at 366.

Diaz did, however, tell Murphy he was doing hurricane work in Florida and out west, that the national team was responding to FEMA projects, so there might be investment opportunities. Tr. at 307-08, 310-311. Specifically, Diaz indicated that he needed up front capital for subcontractors. Tr. at 311. Because Diaz was only looking for a "sizable investment," Murphy took out a $200,000 home equity loan to fund the investment. Tr. at 312-313. Murphy never asked Diaz "what national team the money would be used for because " he was [his] friend and [he] trusted him." Tr. at 313.

On January 3, 2005[8], Murphy gave Diaz a check made payable to "Duraclean Specialists" for $200,000. Ex. AA. Diaz had advised him to use the name Duraclean Specialists on the check. Tr. at 341. In return, Diaz gave Murphy $20,000 as an advanced payment for half the interest he was going to earn over six months. Tr. at 349-356. On January 28, 2005, Murphy gave Diaz a second check for $25,000 also made payable to Duraclean Specialist, which Diaz indicated would be used for work the national team was doing. Ex. BB, Tr. at 331. Diaz advised Murphy it would take six months to complete the job and gave him a postdated check for $265,000 from the Duraclean Specialists operating account[9]. Ex. 119, Tr. at 325, 350. Murphy's fiancee also gave Diaz a check for $40,000, initially as an interest-free loan. Tr. at 360-61.[10] In

---

[8]The date on the check is January 3, 2004. Ex. AA. Murphy testified that the "2004" was written in error because he was used to writing '04. Tr. at 316.

[9]Murphy was given a postdated check for $240,000 after he gave Diaz a check for $200,000. The postdated check for $265,000 replaced the first postdated check to reflect the additional investment. Tr. at 325.

[10]Murphy contends that when the "loan agreements" were redone in July he though he was going to get interest on the $40,000. Tr. at 365.

exchange, Diaz gave Murphy a letter written on plain white copy paper, which stated ""This letter is to certify that I received the sum of two hundred and twenty-five thousand dollars ($225,000) from Robert J. Murphy, to be re-paid to Mr. Murphy or his estate on or before July 3, 2005." Ex. 120. The letter was signed by Steve Diaz and also included a handwritten note "in addition there is a Balance of another 40,000 due on 7/3/05." Pls. Ex. 120.

In July 2005, when repayment was due, Diaz convinced Murphy to extend his loans for an additional six months promising to pay him an additional $26,500 in interest or $291,500 by February 2, 2006. Tr. at 335. Diaz exchanged the July 3rd postdated check of $265,000 for a new postdated check in the amount of $291,500. Tr. at 335-36; Defs. Exs. AA and BB. Murphy never attempted to cash the postdated check because by February 2006, he had learned from Gary Kulik that Diaz did not have the money to repay the loans. Tr. at 340-41.

In September 2006, Murphy was contacted by the Suffolk County District Attorney and filed a criminal complaint against Diaz. Tr. at 344, 368, Defs. Ex. Z. In his sworn criminal complaint, Murphy stated:

> Some time during December 2004, Steve Diaz approached me and told me about the great success of his Duraclean franchise. . . .
>
> Sometime after the Christmas party, Steve Diaz told me he had acquired several big storm clean-up contracts for his Duraclean franchise in Florida and told me he could maximize his profits and give people a large return on their money if they gave him a loan for his Duraclean franchise to be used toward advancing the business. Steve Diaz told me his Duraclean franchise needed money to pay subcontractors in order to get jobs started in Florida on the contracts he already acquired. Steve Diaz also told me people who loaned him money to be used on the Florida contracts of his Duraclean franchise would profit tremendously. . . . Steve Diaz told me there was no risk; the contracts had been obtained by his Duraclean franchise and insurance companies would pay his

Duraclean franchise within six months for the work completed. Steve Diaz further told me money I loaned his Duraclean franchise would increase ten to twenty percent every six months since he and his company were making so much money from the hurricanes in Florida. . . .

As February 2, 2006, the date on the post-dated check from Steve Diaz approached, I began hearing from other people Steve Diaz took loans from that neither he nor his Duraclean franchise had the money to repay me or anyone else. . . . [A]s of this date, I have not received any money or any other consideration from Steve Diaz with regard to the loan I made with him to his Duraclean franchise or the $40,000 loan Elita Dunseath made with Steve Diaz for his Duraclean franchise.

Defs. Ex. Z. Incredibly, despite his sworn complaint to the contrary, Murphy testified that he never told the detective that he was investing solely in Diaz's franchise. Tr. at 381.

### 3. Gary Kulik

Gary Kulik is a also a Mount Sinai school teacher, who met Diaz when they were both coaching football. Tr. at 486. Kulik and Diaz became very close the year before Diaz's son joined the school's football team. Tr. at 487. Kulik practiced with Diaz's son on a weekly basis and the two men often attended football games together. Tr. at 487-88. By 2004, Kulik believed they had "a very special relationship" and in the fall of that year, Diaz began discussing business. Tr. at 490, 492. Diaz told Kulik that his business was very successful and was trying to expand to larger projects. Tr. at 493. Specifically, Diaz told Kulik that he was the "largest franchise; the most money-making franchise." Tr. at 493. Diaz also told Kulik that he had just made a purchase of the entire company and that opportunities were presenting themselves on a national level. Tr. at 490-96, 504-505. Diaz also told Kulik that he could get work from FEMA because he was a minority business. Tr. at 531.

15

In November or December 2004, Diaz approached Kulik on the football field to see if he was interested in a business opportunity.  Tr. at 498.  Kulik was worried that he did not have enough money put away for college and realized that he had let many opportunities pass him by, so he decided to invest, but before he did, he questioned Diaz about the success of his company.  Tr. at 499.  Diaz informed him that his business was expanding and that the loan would be a short-term thing  Tr. at 500-01.  Diaz asked Kulik if he could get him money quickly, so Kulik borrowed $75,000 from his sister, which he gave to Diaz in late January or February 2005.  Tr. at 505-06.  Before that money was repaid, Kulik and his wife took out a home equity loan and then met with Diaz at his Yaphank office.  Tr. at 502.  Kulik gave Diaz a check made payable to "Duraclean" for $200,000 with the expectation that Diaz would repay the loan in two months with ten percent interest.  Tr. at 502-03, 508; Pls. Ex. 112.  In return, Diaz gave Kulik a post-dated check for $220,000.  Tr. at 508.

Kulik never questioned Diaz further regarding the terms of the agreement because "he was a businessman," "he was [his] friend" and "[they] were very close."  Tr. at 503.  On direct examination, Kulik testified that he believed that Diaz had the authority to enter these loans because he was an owner of Duraclean International.  Tr. at 518.  Kulik further testified that as far as he was concerned, "Duraclean International was Duraclean, whether it be [Diaz's] franchise or something larger."  Tr. at 530.  On cross-examination, Kulik acknowledged that he had never heard of Duraclean International until the lawsuit was filed.[11]  Tr. at 535.

---

[11]Kulik's testimony was inconsistent with the sworn statement he gave to the Suffolk County District Attorney in which he repeatedly stated that the loan was made to the Duraclean franchise. Defs. Ex. N.  Kulik also testified that after he made the loan to Diaz he went to the Duraclean.com website, but does not recall seeing anything about Duraclean International.  Tr. at 537.  Kulik may have seen picture of Diaz on the website.  Tr. at 540.

After two months, Kulik asked Diaz if he could cash the check. Tr. at 510. Diaz asked

Kulik to extend his loan for an additional six months because "business was booming." Tr. at

510. Diaz told him there were jobs on a national level down south. Tr. at 511. Diaz promised to

pay Kulik an additional twenty percent for the extra six months and, when he agreed, Diaz gave

Kulik a postdated check for $264,000 drawn against the Duraclean Specialist operating account.

Tr. at 512; Pls. Ex. 113. On February 9, 2006, the postdated check bounced as did another check

Kulik received from Diaz for $2,000. Tr. at 516, 519. Diaz testified that he was responsible for

repaying the loan to Kulik. Tr. at 1030.

### 4. Vincent Ammirato

Vincent Ammirato is a middle school teacher and football coach in the Mount Sinai

School District. Tr. at 547. Ammirato was a close friend of Salbu, coached with Kulik, and

taught the same subject as Murphy. Tr. at 548. Ammirato met Diaz in the fall of 2000 through

the P.A.L. football league. Tr. at 549. Ammirato and Diaz often went for beers after football,

played golf, and socialized. Tr. at 550-555. Ammirato considered Diaz a very close friend and

trusted him. Tr. at 557-58.

Sometime in 2004, Diaz mentioned that his company needed to raise capital for national

jobs they were getting in Las Vegas and Florida. Tr. at 556. Diaz told Ammirato that his

business was exploding and he was looking for a large sum of up front money so that his jobs

could start on time. Tr. at 559-61. After consulting with Kulik and Murphy, Ammirato and his

wife took out a home equity loan in order to invest with Diaz. Tr. at 563-64, 578-79. Because

Ammirato trusted that Diaz would not "do anything that would put [him] in harm's way,

Ammirato invested $100,000 with Diaz. Tr. at 563-64, 570, 602; Defs. Ex. G. Diaz had

promised to repay the loan in six months plus $15,000 in interest.  Tr. at 564.  Ammirato

received two post-dated checks; one check for $100,000 and one check for $15,000, which

checks were drawn of the Duraclean Specialists operating account.  Tr. at 572; Defs. Ex. I and J.

In or about December 2005, Diaz offered to extend Ammirato's loan for an additional six

months because things were going so well.  Tr. at 574.  Diaz gave Ammirato $7,500 representing

half the interest he had earned on the first loan and two new checks postdated June 8, 2006.  Tr.

at 575, 580.  The postdated checks totaling $115,000 bounced.  Tr. at 580.  Ammirato testified

that he thought that Diaz had the right to make loans "as he was acting as an owner of the

company," but acknowledged that he does not recall Diaz ever mentioning Duraclean

International.  Tr. at 581.

### 5.  Kenneth Salbu

Kenneth Salbu is also a teacher in the Mount Sinai school district.  Salbu was close

personal friends with Ammirato and worked with Kulik and Murphy.  Tr. at 387.   Murphy,

Kulik and Ammirato told Salbu about a business opportunity with Diaz.  Tr. at 387.  Based on

his "undying respect for all of them," Salbu asked Ammirato to arrange for a meeting with Diaz.

Tr. at 388.  A meeting was arranged at Diaz's Duraclean facility in Yaphank.  Tr. at 388.  At the

meeting, Diaz gave Salbu a loose-leaf binder full of pictures to help explain the business

opportunity.  Tr. at 389.  At trial, Salbu testified that Diaz told him that he had a national team

that was doing restoration work in the wake of Hurricane Katrina and that it was his role to

garner the contracts.  Tr. at 390.  Salbu also testified that Diaz told him that he was the owner of

the national team, but described the national team generically as "Duraclean." Tr. at 390, 392.[12] Diaz also told Salbu that he needed cash to pay subcontractors on contracted jobs, but he did not show him proof of any jobs. Tr. at 397, 409-10.

On December 8, 2005, Salbu decided to enter into a business agreement with Diaz in part because he trusted Ammirato's judgment. Tr. at 394. Diaz told Salbu that if he invested $100,000 he would receive $15,000 in interest in six months. Tr. at 401. Following the meeting, Salbu took out a home equity loan for $100,000. Tr. at 394. On December 20, 2005, Salbu gave Diaz a check for $100,000 made payable to Duraclean, Inc. in the 7-Eleven parking lot in Mount Sinai. Tr. at 400; Pls. Ex. 115. In exchange, Diaz gave Salbu two checks postdated for June 20, 2006; one for $100,000 and one for $15,000. Tr. at 403. Salbu testified he believed he was giving the money to Diaz's franchise. Tr. at 427. At the time Salbu made the loan to Diaz he had never heard of Duraclean International. Tr. at 413. In addition, Salbu never received any information from Duraclean International nor was he told what position Diaz held in that company. Tr. at 414.

During the months that followed, Salbu began to hear rumblings that Diaz was having repayment difficulties but he did not investigate Duraclean, International because he had complete trust in Diaz as a result of his trust in Ammirato. Tr. at 406. When Salbu deposited the checks, they bounced. Tr. at 403, 413.

_____

[12]At Diaz's criminal trial, Salbu had testified that Diaz never spoke about a national team. Tr. at 424. Salbu also acknowledged that prior to the trial he had never told anyone he thought he was investing in a national team but that he did believe that Diaz was using a "national core of workers, all of which were attending to national disasters." Tr. at 428, 432.

### D. Stephen Diaz and the State Court Criminal Proceeding

Diaz testified that he never spoke to Caffarello about the loans and that Caffarello had no knowledge that he had taken the money from the plaintiffs. Tr. at 1035-36. Diaz was convicted of a crime in New York State court pertaining to his actions in connection with his franchise. Tr. at 889.

### CONCLUSIONS OF LAW

### A. The Joint Venture

The plaintiffs allege that Duraclean International is liable for the debts incurred by Duraclean Specialists, which include the loans they made to Diaz. The plaintiffs' contention presumes the existence of a joint venture between Duraclean International and Duraclean Specialists, resulting from the formation of the "National Team." The plaintiffs argue, in this regard, that since joint ventures are governed by the same legal principles as partnerships[13], Duraclean Specialists was able to bind the joint venture when it borrowed money from the plaintiffs, and thus, Duraclean International is liable for Duraclean Specialist's breach of contract. "[T]he burden of proof in an action for breach of contract is on the plaintiff to prove the elements of its complaint by a preponderance of the evidence." *Milton Abeles, Inc. v. Creekstone Farms Premium Beef, LLC,* No. 06-CV-3893(JFB)(AKT), 2010 U.S. Dist. LEXIS 34017 *14 (E.D.N.Y. Feb. 1, 2010). For the reasons that follow, the court concludes that the plaintiffs have failed to meet their burden.

---

[13]"Under New York law joint ventures are governed by the same legal rules as partnerships because a joint venture is essentially a partnership for a limited purpose." *Fried v. Kelly,* 2007 U.S. Dist. LEXIS 45818 *15 (S.D.N.Y. Jun. 26, 2007), aff'd 2009 U.S. App. LEXIS 6563 (2d Cir. 2009) .

"Under New York law, a joint venture is formed when (a) two or more persons enter into an agreement to carry on a venture for profit; (b) the agreement evinces their intent to be joint venturers; (c) each contributes property, financing, skill, knowledge, or effort; (d) each has some degree of joint control over the joint venture; and (e) provision is made for the sharing of both profits and losses." *SCS Communications, Inc. v. The Herrick Co.,* 360 F.3d 329, 341(2d Cir. 2004); *Brown v. Cara,* 420 F.3d 148, 159-60 (2d Cir. 2005). "The absence of any one element 'is fatal to the establishment of a joint venture.'" *Abeles, Inc.,* 2010 U.S. Dist. LEXIS at *15. Because the plaintiffs have failed to introduce sufficient evidence establishing the existence of an agreement to share profits and losses or any degree of joint control, the court concludes that the "National Team" was not a joint venture between Duraclean Specialist and Duraclean International.

"An indispensable essential of a . . . joint venture, . . . is a mutual promise or undertaking of the parties to share in the profits of the business and submit to the burden of making good the losses." *Id.* at * 32 (citing *Dinaco, Inc. v. Time Warner, Inc.,* 346 F.3d 64, 68 (2d Cir. 2003)). Although the sharing of profits and losses does not have to be precisely equal, "it is not enough that the parties have agreed together to act in concert to achieve some stated economic objective." *Steinbeck v. Gerosa,* 4 N.Y.2d 302, 317-18 (1958). The only evidence presented by the plaintiffs in this matter that touches on the issue of profits or losses is the testimony of Diaz and Cafarello that Duraclean International stood to earn its standard two percent franchise fee for any revenues generated by Diaz's national team. Tr. at 34, 934. The plaintiffs argue, in this regard, that Caffarello assisted in the development of the national team in order to drive up revenues for Duraclean International. While Caffarello acknowledged that Duraclean

International was interested in helping to promote the national team idea because if franchises are successful Duraclean International earns two percent, *see* Tr. at 38 and 1324, this motivation establishes nothing more than a shared economic objective derived from the franchise agreement. The plaintiffs failed to present any evidence suggesting an agreement between Duraclean Specialists and Duraclean International to share in the potential profits of Diaz's national team beyond that standard franchise payment. If the receipt of franchise payments, by itself, were enough to show a joint venture to share profits, every single franchise agreement could be construed as a joint venture, which they are not.

The plaintiffs failed to show any agreement to share losses. Although a national sales team approach was used to develop national business for Diaz's franchise, once the job was procured, Diaz did the invoicing and paid subcontractors on the national jobs. Tr. at 89-90. In fact, with respect to the loans made by the plaintiffs, Diaz repeatedly testified that Duraclean Specialists was legally responsible for repaying the loans. Tr. at 1030, 1034-35. In the absence of an agreement to share profits and losses, the plaintiffs can not prevail on their joint venture theory.

The plaintiffs have also failed to show any measure of joint proprietorship or control over the "National Team." Although the plaintiffs repeatedly emphasized Caffarello's involvement in the procurement of jobs, there was no evidence suggesting the existence of joint ownership or control. In total, Caffarello attended a meeting with representatives of Caesar's, a job which did not pan out, and was involved with the Turner Construction and Proctor & Gamble jobs. Tr. at 48-49, 84, 89-90,1263-1264, 1276-77. He attended a meeting with Turner and helped to secure assistance from other Duraclean franchises when it became clear that Duraclean Specialist could

not handle the Proctor & Gamble work alone. Tr. at 48-49, 1263-1264.  However, beyond acting in a support role as required by the franchise agreement, Duraclean International did not control or direct the activities of the "National Team," which based on the evidence was within the sole province of Diaz and Kelly.  It was Diaz's idea to develop a "national response team" for his franchise, *see* Tr. at 956-957, Kelly chose which jobs to pursue based on his contacts, *see* Tr. at 957, Diaz did the invoicing, received payment, and paid subcontractors, *see* Tr. at 89-90, with the exception of two invoices, all of the documentation reflected that the work was to be done by Duraclean Specialists, *see* Tr. at 90, Duraclean International never lent financial support to the national marketing program being pursued by Diaz, *see* Tr. at 168, 479-480, and any money received by Diaz was commingled in his Duraclean Specialist account regardless of whether the moneys were received for local franchise jobs or "national team" jobs, *see* Tr. at 1027-28.  In sum, the plaintiffs have also failed to show any indicia of joint control, and thus, cannot prevail on their breach of contract claim based on this joint venture theory.

### B.  Vicarious Liability

Throughout the trial and in their post trial submissions, the plaintiffs relied on the joint venture theory to hold Duraclean International vicariously liable for the plaintiff's loans. Although the court concludes that the plaintiffs have not proven the existence of a joint venture, the court will, nonetheless, consider whether Duraclean International was vicariously liable to the plaintiffs due to the control it exercised over the franchise in general.  "In deciding whether a franchisor may be held vicariously liable for acts of its franchisee, courts determine whether the franchisor controls the day-to day operations of the franchise, and more specifically, whether the franchisor exercises a considerable degree over the instrumentality at issue in a given case."

*Hong Wu v. Dunkin' Donuts, Inc.,* 105 F. Supp. 2d 83, 87 (E.D.N.Y. 2000), aff'd 2001 U.S. App.

LEXIS 2544 (2d Cir. 2001). "Where a parent corporation's interference in the subsidiaries'

business is obtrusive," or where the parent "becomes the prime mover or actor in the business of

the subsidiaries, the parent will be held liable" and "the subsidiaries will be deemed a mere

instrumentality or agent of a controlling corporation." *Sbarro Holding, Inc. v. Hien Tien Yuan,*

111 Misc. 2d 910, 914 (Sup. Ct. 1981), aff'd 91 A.D.2d 613 (2d Dep't 1982)(holding that the

arbitration provision set forth in subsidiary's contract would be applied to the parent given that

the franchisee was required to deal with five different Sbarro companies but was led to believe it

was contracting with a single Sbarro entity).

Having reviewed an evaluated all of the evidence, the court finds that Duraclean

International cannot be held vicariously liable for the loans made to Diaz because Duraclean

International did not exercise control over Duraclean Specialist. As discussed above, at best,

Caffarello worked with Duraclean Specialist to support the national team effort by attending a

number of meetings with potential "national clients" and providing any needed assistance. Tr. at

454-56. The plaintiffs emphasize that Duraclean International's financials and their certificate of

insurance were used as part of a qualification package in order to obtain the Skanska job.

Duraclean International, however, did not authorize this submission and has been unaware of it

until this case began. Tr. at 973-79, 1308. Moreover, the submission of Duraclean

International's financials on a single job does not establish the level of control needed for

vicarious liability.

Duraclean International had no involvement in Diaz's business apart from the limited

support for the "National Team." With respect to the "National Team," Diaz made it clear to

24

everyone he spoke to that it was his idea and he was in control. Diaz hired John Kelly as his "national director," Kelly answered to Diaz, and worked for Duraclean Specialist. Tr. at 168, 483, 480. In fact, Kelly believed that at most he spoke to Caffarello four times a year. Tr. at 478. Duraclean International never lent financial support to the "National Team." Tr. at 168, 440, 479-80. Kelly chose which large national accounts to pursue based on his connections with certain Fortune 500 companies. Tr. at 43-44, 450. There is simply no evidence that Duraclean International had any involvement in which accounts to pursue or how the jobs would be managed. Tr. at 455 463. Duraclean Specialist did its own invoicing, received payments, and paid its subcontractors. Tr. at 89-90. In fact, Duraclean International only got involved with Diaz's "National Team" when they were sought out by Diaz. Accordingly, there was simply no evidence presented to support the idea that Duraclean International was a controlling corporation so as to make it vicariously liable for the acts of its franchise.

### C. <u>Apparent Authority</u>

The plaintiffs have also failed to show that Diaz acted with apparent authority to bind Duraclean International when he entered into the loans agreements with the plaintiffs. "The mere creation of an agency for some purpose does not automatically invest the agent with 'apparent authority' to bind the principal without limitation." *Ford v. Unity Hospital,* 32 N.Y.2d 464, 472 (1973). "A principal may be bound by the actions of an agent on the basis of apparent authority only where it is shown that the third party - [the plaintiff in this case] - reasonable relied upon the representations of the agent 'because of some misleading conduct on the part of the principal." *Stichting Ter Behartiging Van De Belangen Van Oudaandeelhouders In het Kapitaal Van Saybolt Int'l B.V. v. Schreiber,* 407 F.3d 34,56 (2d Cir. 2005). In other words, regardless of

Diaz's representations to the plaintiffs about the national team or his ownership interest in Duraclean International, there must be "reliance nexus" between Duraclean International and the plaintiffs. *Id.*

The plaintiffs place much emphasis on the fact that Diaz was a fifty percent owner of Duraclean International. Vengilio testified that in 2003, he learned that Diaz was a part-owner in Duraclean International so Vengilio believed he was getting jobs on behalf of Duraclean International. Tr. 208-09, 228, 230, 1005-06. Kulik testified that Diaz had told him that he had just made a purchase of the entire company and that opportunities were presenting themselves on a national level, so he believed that Diaz had authority to enter into loans on behalf of Duraclean International. Tr. at 496, 504-505, 518. Ammirato testified that he thought Diaz had the right to make loans because he was acting as an owner of the company. Tr. at 581. Yet, this testimony is inconsistent with the balance of the evidence presented in this case.

Murphy testified that Diaz never referred to Duraclean International when they discussed the investment and that he first learned of the existence of the company at his deposition in the case. Tr. at 313, 349, 366. Salbu testified that at the time he made the loan to Diaz he had never heard of Duraclean International and did not know what position Diaz held in that company. Tr. at 414. On cross examination, Kulik admitted that he was not aware of Duraclean International until the lawsuit was filed. Tr. at 535. Ammirato admitted that he did not recall Diaz ever mentioning Duraclean International. Tr. at 581. And, while Vengilio may have relied on Diaz's claim that he was an owner of Duraclean International, in 2003, this was simply not the case. Tr. at 214-222, 228, 262. Moreover, Vengilio admitted in his deposition that Diaz's claimed connection to Duraclean International was not a "critical" factor in his decision to invest. Tr. at

272-73.

Finally, there is no evidence to suggest that Duraclean International played any role in any of the plaintiffs' misconceptions. The plaintiffs did not turn over $750,000 to Diaz because they were misled by conduct on the part of Duraclean International. Unfortunately, the plaintiffs "invested" with Diaz, because they trusted him, they were struck by his affluence, and for several of them, because they didn't want to miss out on the lucrative investment opportunity being offered by a friend. Vengilio did not invest with Diaz because of Caffarello of Duraclean International, Vengilio trusted Diaz and "lived without questioning him." Tr. at 216-217. Murphy never asked questions about the national team and invested with Diaz because he was a friend and he "just took whatever he said" at face-value. Tr. at 313, 383. Kulik invested with Diaz because they had a very special relationship and he believed Diaz's success stories. Tr. at 492, 503, 530, 535. Ammirato didn't want to miss out on the sure thing being offered to Kulik and Murphy. Tr. at 563-64. He, too, believed that Diaz would never do anything to put him in harms way. Tr. at 563-64. Salbu was influenced by Ammirato, Kulik and Murphy, and decided to take advantage of the business opportunity being offered to his friends because of his "undying respect" for his colleagues. Tr. at 388, 394. They all regrettably fell victim to Diaz and his many lies.

The fact that Caffarello had an agreement to sell his shares to Diaz, which went into default within eleven months when Diaz failed to pay, at best, had an indirect effect on these events because it contributed to Diaz's persona. This fact, alone, however, does not give rise to the type of misleading conduct on the part of a principle needed in invest an agent with apparent authority. Accordingly, having reviewed all of the evidence, including the testimony and

demeanor of all of the witnesses, the court finds that Diaz did not have apparent authority to borrow money from the plaintiffs on Duraclean International's behalf.

**D.  Usury**

Given the court's prior determinations, the court need not address the testimony emphasized by Duraclean International throughout the trial regarding the interest rates that were to be earned on the loans.  However, the court notes that "under New York law, a borrower may be estopped from interposing a usury defense when, through a special relationship with the lender, the borrower induces reliance on the legality of the transaction."  *Sabella v. Scantek Medical, Inc..* 2009 U.S. Dist. LEXIS 88170 at *62 (S.D.N.Y. Sept. 21, 2009).  The plaintiffs presented ample evidence that "a longstanding friendship or its equivalent" existed between the plaintiffs and Diaz, and therefore, the usury defense would not have been available to Duraclean International.  *See Hufnagel v. George,* 135 F. Supp. 2d 406 (S.D.N.Y. 2001).

## CONCLUSION

In sum, the plaintiffs have failed to prove by a preponderance of the evidence their breach of contract claim.  Accordingly, the court finds in favor of the defendant.  The Clerk of the Court shall enter judgment accordingly and close the case.


Dated: Central Islip, New York           **SO ORDERED**
      July 13, 2011
                                        _____/s/_____
                                        Arlene Rosario Lindsay
                                        United States Magistrate Judge